Chester N. Williams and Ann E. Williams, Husband and Wife v. Commissioner.
Williams v. Commissioner
Docket No. 64309.
United States Tax Court
T.C. Memo 1960-275; 1960 Tax Ct. Memo LEXIS 15; 19 T.C.M. (CCH) 1526; T.C.M. (RIA) 60275; December 23, 1960
*15 Petitioners' unadjusted basis in rental property inherited from Chester's father, on which lessee had constructed improvements before father's death under a lease which terminated after father's death, held, to be fair market value of land and building at date of father's death in 1926 as determined for Federal estate tax purposes. Adjustments must be made for allowable depreciation, based on useful life and value of building at time of father's death, in computing loss incurred on involuntary sale of property in 1951. Elmer H. V. Hoffman, Esq., for the petitioners. Eugene F. Reardon, Esq., for the respondent. DRENNEN
Memorandum Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioners' income tax for the years 1951, 1952, and 1953 in the amounts of $1,857.04, $257.47, and $1,555.98, respectively. The only issue raised by the pleadings is whether petitioners are entitled to deduct a loss on the involuntary conversion of an interest in rental property owned by petitioner Chester N. Williams as an operating loss in the year 1951, and carryovers of that loss in the years 1952 and 1953. All of the facts were stipulated and are so found. The *16 facts pertinent to this decision are as follows: Petitioners Chester N. Williams and Ann E. Williams are husband and wife residing in Laguna Beach, California. Their joint income tax returns for the years involved were filed with the collector or director of internal revenue, Los Angeles, California. Ann E. Williams is a party herein solely because she and Chester filed joint returns and Chester N. Williams will hereinafter be referred to as petitioner. In 1922 petitioner's father, sometimes hereinafter referred to as decedent, owned certain unimproved land located in downtown Los Angeles on West 7th Street. Petitioner's father leased the land to Stuart M. Salisbury, an individual, on August 1, 1922. The lease was for a term of 15 years commencing on August 1, 1922, and provided, among other things, that the lessee should construct a building or buildings upon said premises costing not less than $50,000. The lease also provided: IV. Ownership of New Building. All buildings constructed on said premises by the Lessee shall remain on said land and shall become the absolute property of the Lessor, without cost to him, upon any termination of this lease, whether by lapse of time *17 or by forfeiture or otherwise. Nothing in this section, or in the section numbered XII and headed "Forfeiture by Default", or elsewhere in this lease, shall be construed as placing the title of the new buildings to be erected in the Lessee but said new buildings shall be part of the land and the title to the same shall at all times be in the Lessor, subject to the leasehold interest of the Lessee in the same manner as the land itself. The lessee was required to pay for all utilities, maintenance, and repairs, to pay all taxes, and to pay the lessor the sum of $25,000 as rental, payable $5,000 per year during each of the last five years of the lease, commencing August 1, 1932. The lessee was given the right to assign the lease in whole or in part. On October 30, 1922, Stuart M. Salisbury assigned the lease to the Sun Realty Company for certain considerations. Sun Realty Company constructed a building on the land in 1924 at a cost of $63,000. The building consisted of a 2-story stucco frame construction containing 10 stores and a 36-room hotel. At the time of its completion the building had a useful life of 40 years. Petitioner's father died on October 4, 1926. The land and building *18 was valued for Federal estate tax purposes at $500,000. It was also appraised by the qualified and acting inheritance tax appraiser for Alameda County, California, at $500,000. No allocation of the $500,000 valuation was made between land and building. After completion of the building the Sun Realty Company operated it as a hotel and rented the 10 ground floor areas as stores until 1932 when it ceased operating the building under the lease and voluntarily abandoned the premises. Under the terms of the lease this abandonment by the lessee-assignee terminated the lease. Under the terms of the will of petitioner's father title to the land, including any interest in the building, passed to a testamentary trust in which the Bank of California was named as trustee. Under the terms of the trust petitioner received a four-fifteenths interest in the land and the building, and his brothers and sisters received the remaining interest. The land and building were held in the trust until September 8, 1937, when under its provisions the trust terminated and the corpus was distributed to the beneficiaries. The beneficiaries continued to operate the building as a hotel with ground floor store rentals. *19 Petitioner performed some managerial functions in operating the hotel, such as obtaining tenants, supervising improvements, etc. Petitioner's four-fifteenths interest in the land and building was not held by him primarily for sale to customers in the ordinary course of any trade or business. Petitioner was not in the trade or business of disposing of real property or rental property in any manner. On or about November 22, 1950, the State of California initiated condemnation proceedings to acquire the land and building for the purpose of building a "free-way" through such property. Petitioner and the other owners of the property opposed the condemnation and contended that the price offered by the State for the land and building did not constitute adequate compensation. Court proceedings were commenced to determine the amount of compensation to be paid by the State, which were terminated on September 26, 1951, when a final judgment was entered in the Superior Court of the State of California for the County of Los Angeles, under which title to the property passed to the State of California on September 25, 1951, and the compensation to be paid for the property was determined to be a *20 total amount of $231,000, of which $161,250 was allocated to the land and $69,750 was allocated to the building. In October 1951 the State of California paid petitioner four-fifteenths of $231,000, or $61,600 for his interest in the land and building. During 1951 petitioner incurred expenses in connection with the condemnation litigation in a total amount of $7,039.14, including his share of the expenses incurred by the owners collectively. Petitioners' original joint income tax return for the year 1950 was filed on March 15, 1951. This return reported the sale of the property and described it as having been acquired in 1933 at a cost of $500,000, $300,000 of which was allocable to the land and $200,000 of which was allocable to the building, petitioner's four-fifteenths interest in the building being $53,333. Depreciation claimed in previous years (1933-1949) in the amount of $13,283.33 was deducted from petitioner's interest in the building, leaving a balance of $40,049.67. From this balance was deducted $24,000, represented as being the value of petitioner's four-fifteenths interest in the value placed on the building of $90,000 in the condemnation proceeding. The balance of *21 $16,049.67 was claimed on the return as a loss in future depreciation. As a result petitioner reported a loss in adjusted gross income for the year 1950. On the original joint income tax return filed by petitioners for the year 1951 petitioners claimed a long-term capital loss, to the extent of $1,000, on the condemnation of the aforesaid property in 1951, computing basis in the property in the same manner as computed in the 1950 joint return except that the additional amount of $16,049.67 depreciation claimed in the 1950 return was deducted from basis. The original joint income tax return for 1952 also claimed a net capital loss carryover, limited to the extent of $1,000, from the sale in 1951, computed in the same manner as computed in the 1951 return. On or before April 29, 1954, petitioners filed amended joint income tax returns for each of the years 1950, 1951, and 1952, and claims for refund for the years 1951 and 1952, wherein they claimed the loss as an operating loss from the condemnation of the 7th Street property by the State of California, seized December 1950. The loss was computed by using $500,000 as the cost of the property, to which was added $21,332.63 as expenses *22 of the sale of the property, totaling $521,332.63, from which was deducted the value set by the jury at the trial September 1951 in the amount of $231,000, leaving a gross operating loss of $290,332.63, of which petitioner's four-fifteenths share was $77,422.04. From the petitioner's share of the loss was deducted depreciation in previous years in the amount of $14,133.33, leaving a net operating loss of $63,288.71. To this was added $500 as expense of clearing title in 1944, for an adjusted net operating loss of $63,788.71. For some unexplained reason the returns charged $9,000 of this loss to the year 1949 and $9,638.59 of the loss to the year 1950, and $9,000 of the loss was claimed on the amended return for 1951. This left a net operating loss carryover to the year 1952 in the amount of $36,150.12, $3,000 of which was claimed as a net operating loss deduction on the amended 1952 return, leaving a balance of $30,638.59 for carryover to 1953. Petitioners' original joint income tax return for 1953 was filed on March 15, 1954, and claimed a net operating loss from the carryover in the amount of $9,000. In a schedule attached to the return the loss was computed in the same manner *23 it had been computed in each of the amended returns for the 3 prior years referred to above. No explanation was given in any of the amended returns or in the original 1953 return for the amount of the loss allocated to each year, and the amounts were incorrect in each year. Respondent's notice of deficiency dated June 25, 1956, made adjustments to net income as disclosed on petitioners' original returns for the years 1951-53. [1] Respondent disallowed the capital loss from the sale of this property claimed on the 1951 and 1952 returns with the explanation: "It has been determined that the loss from said condemnation of property does not constitute a capital loss as defined in the Internal Revenue Code of 1939." Respondent also disallowed the net operating loss deduction claimed on the 1953 return with the explanation: "It has been determined under the provisions of the Internal Revenue Code for 1939 that you sustained no net operating loss in 1950." *24 A decision on whether petitioner incurred a loss on the involuntary conversion of his interest in the property mentioned above in 1951, and, if so, the amount of such loss, will be determinative of the only issue remaining. Respondent concedes on brief that the loss, if established, is includible in computing a net operating loss for 1951, and the amount, if any, of the carryback and carryover of that loss to other years involved can be computed under Rule 50. On brief respondent relies entirely on the proposition that petitioner has failed to prove his basis in the property, without which he has failed to prove any loss. Petitioner, while insisting that the stipulated facts prove his basis, also claims on reply brief that respondent, having never before specifically questioned the basis claimed by petitioner on his returns, is raising a new issue and has the burden of disproving the basis claimed by petitioner. [2] We find it unnecessary to decide this question of burden of proof because we believe a determination of petitioner's basis in the property can, with some difficulty, be made from the stipulated facts and exhibits attached thereto. *25 The basis of property for determining gain or loss must be determined under the law in effect at the time the sale is made. Elizabeth P. Patterson, 33 B.T.A. 57. The pertinent part of section 113(a)(5) of the 1939 Code, effective in 1951, provides with respect to basis as follows: (5) Property transmitted at death. - If the property was acquired by bequest, devise, or inheritance, or by the decedent's estate from the decedent, the basis shall be the fair market value of such property at the time of such acquisition. * * * Respondent agrees that the general rule is that the basis of property acquired from a decedent is its fair market value at the date of decedent's death, but argues that it is not clear from the evidence whether petitioner acquired the building here involved (1) at his father's death, or (2) upon termination of the lease, or (3) upon termination of the trust, and if petitioner acquired his interest in the building at some date other than the date of his father's death, the value at such later date would be controlling as to basis. This argument begs the question. It seems well settled since the Supreme Court decision in Helvering v. Reynolds, 313 U.S. 428, *26 that the statutory language "at the time of such acquisition," employed in section 113(a)(5) of the 1939 Code and its predecessor sections of the internal revenue laws, refers to the date of death of the decedent from whom the property was inherited, even though the property was under the terms of the will placed in trust for the life of another with remainder over to the taxpayer in the event he survives the life tenant, and whether his remainder interest was vested or contingent. Regs. 111, sec. 29.113(a)(5)-1; Regs. 86, art. 113(a)(5)-1(b) F. 2d 719; Van Vranken v. Helvering, 115 F. 2d 709 (C.A. 2, 1940), affirming 40 B.T.A. 956. Petitioner therefore acquired a basis in whatever interest in this property his father owned, whether it included building or land only, equal to four-fifteenths of the value of the property at the date of his father's death. The value of property as of the date of decedent's death shall be deemed to be the value thereof as appraised for the purpose of the Federal estate tax or, if the estate is not subject to tax, its value as appraised for State inheritance taxes. Regs. 111, sec. 29.113(a)(5)-1(c). It is stipulated that the *27 entire property was valued for Federal estate tax purposes at $500,000. Petitioner's basis in what he acquired from his father was therefore $133,333.33. If the property acquired from his father was only land, as suggested by respondent, no adjustment to this basis would be required by section 113(b) of the 1939 Code, and petitioner would have a loss on the sale of the land equal to the difference between this basis, plus litigation and other expenditures properly attributable to the land, and the amount of the condemnation award allocable to petitioner's interest in the land. Any additional basis that might have been acquired during the term of the trust as a result of termination of the lease would only serve to increase petitioner's basis, and he claims none. [3]
However, we think it is clear from the evidence we do have that petitioner's father owned the building as well as the land at *28 the time of his death, and that the $500,000 value placed on this property in his estate included the value of the land and building. The best evidence from which we could determine decedent's interest in the building at the time of his death is the lease itself, which is stipulated in evidence. The lease provides that the lessee shall construct a building on the property at his own cost of not less than $50,000, and it is stipulated that the lessee did construct a building on the land in 1924 at a cost of $63,000. While the lease provides that all buildings constructed on the premises by the lessee "shall remain on said land and shall become the absolute property of the Lessor, without cost to him, upon any termination of this lease," it also provides in the same section that nothing in this section or elsewhere in the lease shall be construed as placing the title of the new buildings in the lessee but said buildings "shall be part of the land and the title to the same shall at all times be in the Lessor, subject to the leasehold interest of the Lessee in the same manner as the land itself." We construe this and other provisions in the lease to place title in the building, or an interest *29 equal in value to full title, in petitioner's father, as lessor, when the building was completed, which title or interest he held at the time of his death, and the value of which was included in the $500,000 value placed on this property in his estate. This is supported by the appraisal itself which refers to both the land and building. We therefore conclude that petitioner's basis in this property included his share of the value of both the land and building at the date of his father's death. Respondent argues that even if petitioner is entitled to this unadjusted basis in the property, there was no allocation of the appraised value between land and building and there is insufficient evidence to make a proper allocation; therefore, petitioner has failed to prove his adjusted basis in either the land or the building. It is true that the appraisal made no allocation as between land and building, and that we have no expert evidence on that subject. But the only need for such allocation is to determine the amount of allowable depreciation on the building which must be deducted to arrive at petitioner's adjusted basis. Sec. 113(b), I.R.C. 1939; Virginian Hotel Co. v. Helvering, 319 U.S. 523. *30 It is stipulated that the building was completed in 1924, just 2 years before decedent's death, at a cost of $63,000, and that the useful life of the building at the time of its completion was 40 years. Such facts would certainly afford some basis for determining the allowable depreciation on the building. If $63,000, or some figure near that, is used as the value of the building at the date of decedent's death and a 40-year useful life is used for depreciation purposes, it would produce allowable depreciation on petitioner's interest in the building from 1926 to 1951 of less than the amount claimed by petitioner on his returns. This would also result in a smaller adjusted basis in the building than claimed by petitioner but a larger basis in the land than claimed. On each of petitioner's original returns for the years 1950, 1951, and 1952, the cost of the property was reported as $500,000 and the loss was computed by using a total basis in the land of $300,000 and in the building of $200,000, petitioner's four-fifteenths interest in the building being set up at $53,333. On the amended return for 1950 petitioner computed depreciation on the building as property having been acquired *31 in 1933 with a basis of $32,000, and claimed depreciation in the amount of $800, which is 2 1/2 per cent of $32,000. In computing the loss on the sale of the property in 1951, the amended returns for the years 1950-52 and the original return for 1953 do not allocate either petitioner's basis or the sales price between land and building, but lumped them together and deducted depreciation from prior years of $14,133.33, which is also $800 per year from 1933 to 1951. In his notice of deficiency respondent did not question any of the figures used by petitioner on the returns or in the petition for computing the loss, nor did he do so in his answer, but simply disallowed and denied the losses claimed on the ground that petitioner did not sustain a capital or operating loss on condemnation of his interest in the property. While we are skeptical that a building that cost only $63,000 to build in 1924 would have the value of $200,000 allocated by petitioner to it in 1926, under the circumstances we accept petitioner's allocation of the $500,000 date of death value of this property and hold that $300,000 thereof was the value of the land and $200,000 was the value of the building at the time *32 of decedent's death. Some support for this allocation is found in the fact that in his amended return for the year 1950 petitioner used a 1933 value of $32,000 for his fourfifteenths interest in the building for purposes of computing depreciation. This would indicate a total value in the building in 1933 of $120,000, and the 1926 value should have been greater than the value in 1933. The stipulated 40-year useful life for the building as of the date it was completed in 1924 will also be used as the remaining useful life of the building at the date of decedent's death for purposes of computing allowable depreciation. We conclude that petitioner is entitled to deduct as an operating loss in the year 1951 a loss incurred on the involuntary conversion of his four-fifteenths interest in the rental property on West 7th Street in Los Angeles computed in accordance herewith. Petitioner's unadjusted basis in the property was four-fifteenths of the $500,000 total value of the property on the date of his father's death in 1926, of which $300,000 is allocable to the land and $200,000 to the building. Using a 40-year remaining useful life for the building as of the date of death, allowable depreciation *33 shall be computed to the date of sale, and shall be deducted from petitioner's unadjusted basis. To this shall be added the $7,039.14 expenses of sale stipulated to have been incurred by petitioner in 1951, to arrive at petitioner's adjusted basis for computing loss on the sale. The sale price has been stipulated. The $500 expense of clearing title in 1944 claimed as an addition to basis on petitioner's amended returns was not claimed on the original returns and there is no other evidence to support this expenditure; consequently, it will not be added to basis. The amount of the net operating loss carryovers to the years 1952 and 1953 will be computed according to the law and will be allowed in computing petitioner's net operating loss deductions for those years. Petitioner has not claimed error in any other adjustments to income made by respondent in his notice of deficiency and they are presumed to be correct. Decision will be entered under Rule 50. Footnotes
1. No explanation was given why respondent ignored the amended returns filed by petitioners. It is stipulated that petitioners did not report any tax due in their original 1950 return and paid no tax with such return; therefore, the respondent disregarded the purported amended return for 1950 either as an amended return or as a claim for refund. It is also stipulated that the applicable statute of limitations ran against the respondent on March 15, 1954, as to the original return for the year 1950 and that petitioners received the tax benefit of claiming a condemnation loss in the amount of $16,049.67 in their original return for 1950.↩
2. Nowhere in this record has respondent stated his reason for disallowing the loss claimed other than to deny that petitioner sustained a capital loss or operating loss from condemnation of the property. One purpose of the pleadings is to draw the issues between the parties, thereby avoiding the necessity of proof of matters not in contest and making available to the Court all available evidence upon which the real issues should be decided. Such does not appear to have been done here. We are doubtful that there is really a question as to who has the burden of proof. It is more a question whether respondent should be heard to argue this ground for disallowance of the loss at this time.↩
3. Respondent suggests that under the tax laws effective upon termination of the lease in 1932 the lessor might have acquired a basis in improvements built by the lessee. Absent any proof of this, and in view of our interpretation of the lease, this argument would not affect our conclusion.↩